### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| PATRICK JONES and KYLE STIRNAMAN | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | Case No. _____15-249_____ |
| APPLE, INC., | ) | |
| Defendant. | ) | |
| | ) | **PLAINTIFFS DEMAND TRIAL BY** |
| SERVE: | ) | **JURY ON ALL TRIALABLE COUNTS** |
| Timothy D. Cook | ) | |
| CEO of Apple, Inc. | ) | |
| 1 Infinite Loop | ) | |
| Cupertino, CA 95014 | ) | |

### CLASS ACTION COMPLAINT

### INTRODUCTION

Patrick Jones and Kyle Stirnaman bring this lawsuit on behalf of the similarly situated Illinois citizens against Apple for misrepresenting that the iPhone 4S is a 4G phone on iOS 5.1 and later versions of the operating system.  Beginning on March 7, 2012, Apple changed the network indicator on certain iPhone 4Ss to state that the phone was a 4G mobile device.  While the iPhone 4 and the iPhone 4S contain the same cellular technology, the iPhone 4 continued to display "3G" with iOS 5.1 and later versions.  In other words, Apple represented that its broadband chip in one iPhone was a 3G technology while that same broadband chip in another phone was a 4G technology.  The "G" or generation of cell phone technology is set by the specific standards propagated by the International Telecommunications Union, a specialized agency of the United Nations.  The iPhone 4S does not comply with those standards for 4G telecommunications and is not a 4G phone.

Plaintiffs make three claims in this lawsuit.  In Count I, Plaintiffs claim that Apple made misrepresentations and omissions of material facts concerning the capabilities of the iPhone 4S in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.  In the Second Count, Plaintiffs claim that Apple fraudulently omitted material facts relating to the capabilities of the iPhone 4S in violation of the common law.  In their Third Count, Plaintiffs claim that Apple was unjustly enriched, and that Apple must return the benefit that it wrongfully retained.

## PARTIES

1.      Plaintiff Patrick Jones is a citizen of the State of Illinois and a resident of this District.  In July, 2013, he bought an iPhone 4S with the iOS 5.1 or later operating system that displayed "4G" on the network indicator when connected to a High Speed Packet Access cellular network.

2.      Plaintiff Kyle Stirnaman is a citizen of the State of Illinois and a resident of this District.  On April 26, 2012, he bought an iPhone 4S with the iOS 5.1 or later operating system that displayed "4G" on the network indicator when connected to a High Speed Packet Access cellular network.

3.      Defendant Apple, Inc. ("Apple"), the maker of the iPhone 4 and the iPhone 4S, is a California corporation with its principal place of business in California.  Apple is the most valuable company in the world, and on February 10, 2015, it became the first company with market capitalization over $700 billion.  In July, 2011, Apple had an operating cash balance of 76.8 billion dollars, which was greater than the operating cash balance of the U.S. Treasury, which was 73.8 billion.  In early 2012, Apple's CEO, Tim Cook, became the world's most

highly paid executive officer, receiving 1 million shares of Apple stock which had a cash value of approximately $600 million dollars[1].

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d)(2).  Plaintiffs are citizens of Illinois, Defendant is a citizen of California, and the amount in controversy exceeds $5,000,000.00.

5.      Venue is proper with this Court pursuant to 28 U.S.C. § 1391 in that Plaintiffs are residents of this District, many of the acts and transactions giving rise to this action occurred in this District, and because Apple:

> a. is authorized to conduct business in this District and has availed itself of the laws and markets within this District through the promotion, marketing, distribution and sale of its products in this District;
>
> b. does substantial business in this District;
>
> c. is subject to personal jurisdiction in this District; and,
>
> d.  most of the actions that give rise to Plaintiffs' claims in this case, including misrepresentations, omissions, and payments and impoverishments occurred in this District.

## FACTS

### The ITU, The 3GPP & The "Generations" Of Cellular Telecommunications

6.      The "generation" of a mobile device[2] refers to the technological capabilities of that device in relation to international telecommunications standards.  When mobile telecommunications became digital, the most significant measure of the "G" or generation designation for cellular technologies was data transfer speeds.

---

[1] The stock subsequently underwent a 7-for-1 split, and the current value of Mr. Cook's stock is over $900 million.
[2] By "mobile device", this author refers to cellular phones and tablets with cellular network capabilities.

7.      The International Telecommunication Union ("ITU") is the specialized agency of the United Nations that coordinates the shared global use of the radio spectrum and sets international cellular and radio standards, including the standards for the generation designations for mobile devices.  The ITU headquarters is located in Geneva, Switzerland, and Houlin Zhao, a Chinese national, is the current Secretary General.  Dr. Hamadoun I. Touré of Mali was the Secretary General from January 1, 2007 until December 31, 2014.  While the ITU does not have power to enforce any of its rules or requirements, and does not formally define the terms "3G" and "4G", it creates and propagates the standards for the mobile devices that are referred to and marketed as "3G" and "4G" technologies.

8.      Established in December, 1998, the 3rd Generation Partnership Project (3GPP) is a collaboration between groups of telecommunications associations, known as the Organizational Partners. The initial scope of 3GPP was to make a globally applicable third-generation (3G) mobile phone system specification based on evolved Global System for Mobile Communications (GSM) specifications within the scope of the International Mobile Telecommunications-2000 (IMT-2000) project of the International Telecommunication Union (ITU). The scope was later enlarged to include the development and maintenance of: the Global System for Mobile Communications (GSM) including GSM evolved radio access technologies (e.g. General Packet Radio Service (GPRS) and Enhanced Data Rates for GSM Evolution (EDGE)); and, an evolved third Generation and beyond Mobile System based on the evolved 3GPP core networks.

9.      1G refers to the first-generation of mobile telecommunications.  Introduced in the 1980s, these analog telecommunications standards had data speeds of 2.9 kilobits per second ("kbit/s") for 28k modems to 5.6 kbit/s for 56k modems.  This form of telecommunications was retroactively dubbed "1G" when it was replaced by 2G digital networks.

10.     2G refers to the second generation of wireless telephone technology.  It was the first generation of cellular telecommunications to utilize digital data transfers.  The first 2G network was launched in 1991 in Finland on the GSM (Global System for Mobile Communications) standard.

11.     EDGE, or Enhanced Data rates for GSM Evolution, is a form of digital telephone technology that allows for improved data transmission on the 2G GSM network.  Cingular (now AT&T Mobility, LLC ("AT&T Mobility" or "AT&T")) launched the first GSM network in the United States in 2003.  EDGE is an upgraded 2G telephony protocol.  Although it is considered a pre-3G radio technology and is considerably slower than other 3G technologies, EDGE was included in the definition of 3G by the ITU.

12.     3G refers to those mobile phones and telecommunication networks that satisfy the standards of the International Mobile Telecommunications-2000 (IMT-2000) of the ITU.  To satisfy ITU standards for 3G telecommunications, the system must provide peak data rates of at least 200 kbit/s.

13.     EV-DO, or Evolution-Data Optimized, is a telecommunications standard that uses the code division multiple access (CDMA) multiplexing technique.  It has a maximum interface speed of 3.1 megabits per second ("Mbit/s")s.  It is a 3G mobile technology.

14.     UMTS, or Universal Mobile Telecommunications System, is a 3G mobile telephone network technology that was launched in the United States in 2004.   UMTS standards are defined by an organization known as the 3rd Generation Partnership Project ("3GPP").

15.     HSDPA, or High-Speed Downlink Packet Access, is an enhanced 3G mobile telecommunications protocol that operates on the UMTS networks.  It supports theoretical down-link speeds of up to 99.3 Mbit/s, though not on any domestic telecom network.

16.     HSUPA, High-Speed Uplink Packet Access, is a 3G mobile telephony protocol on UMTS networks with up-link speeds of up to 5.76 Mbit/s.

17.     HSPA is a mixture of HSDPA and HSUPA telecommunication protocols.  It utilizes a frequency-division duplexing channel access method (shortened to UMTS-FDD or WCDMA (Wideband Code Division Multiple Access)), by which the transmitter and receiver operate at different frequencies.

18.     HSPA+, or Evolved High-Speed Packet Access, is 3G-based standard in the UMTS family.  The term HSPA+ is a colloquialism for the improvements to HSPA made in the 3rd Generation Partnership Project release 7 and later releases.  It represents an evolution of High Speed Packet Access, which is marketing-speak for the upgrading of older 3G networks. HSPA+  provides data rates up to 84 Mbit/s in the downlink and 10.8 Mbit/s in the uplink (per 5 MHz carrier) by using a multiple-antenna technique known as MIMO (for "multiple-input and multiple-output"), higher order modulation (64-QAM).  By combining multiple cells into one with a technique known as Dual-Cell technology, the aforementioned data rates can be doubled. In order to qualify as an HSPA+  mobile device under release 7, a cellular phone must utilize one or more of the following: 1) a MIMO technique; 2) high order modulation (64-QAM), or 3) Dual-Cell technology.

19.     Like the ITU, the 3GPP does not have police power to enforce its standards.  Moreover, the 3GPP has not provided a clear definition of what constitutes HSPA+ technology.  Rather, the 3GPP has specified that HSPA+ technologies begin with release 7, and that release 7 must include MIMO, 64-QAM, Dual-Cell capabilities, or a combination of these technologies.   As such, a release 5 category 10 devices such as the iPhone 4S, that does not employ MIMO, 64-QAM or Dual-Cell technologies, is not an HSPA+ mobile device.

20.     Prior to October 21, 2010, the terms 3.5G, 3.9G and Pre-4G were terms applied to disparate mobile telephony and data technologies designed to provide better performance than 3G systems, as an interim step towards deployment of full 4G capability.  HDSPA was dubbed 3.5G, 3G+, or Turbo 3G to indicate its higher data speeds.  LTE and WiMax technologies were called 3.9G and Pre-4G to indicate they have greater capacities than other 3G technologies while falling short of the IMT-Advanced standards for 4G technologies.

21.     "Evolved 3G technologies" refers to specific technological advancements to existing 3G technologies to give those technologies greater data transfer capabilities.  LTE, or Long Term Evolution, defined by 3GPP releases 8 and 9, is considered an evolved 3G technology and the natural upgrade path for carriers with both GSM/UMTS networks and CDMA2000 networks. Likewise, Evolved High Speed Packet Access (HSPA+), which is defined by 3GPP Release 7 and beyond, may be considered an evolved 3G technology when it employs 64-QAM modulation, a MIMO antenna technique, dual-cell HSDPA, or a combination of these technologies to achieve significant increases to data transfer speeds in relation to other 3G technologies.

22.     4G refers to the fourth generation of cell phone mobile communications standards. While the ITU has not provided a technical definition for 4G mobile technology, it has set forth the IMT-Advanced as the requirements for what should be marketed as 4G mobile devices.  In an October 21, 2009 press release from the ITU, Stephen Blust, Director of Radio Standards, AT&T and Chairman of Working Party 5D[3] explained that the IMT-Advanced standards represent 4G mobile technology, stating:

---

[3] The Working Party 5D is the ITU committee responsible for the overall radio system aspects of International Mobile Telecommunications (IMT) systems, comprising the current IMT-2000 systems and the future IMT-Advanced systems.

In 2002 when the strategic vision for 4G — which we designated as IMT-Advanced — was laid out in anticipation of the longer term future needs of the marketplace, it established a new level of expectation for the capabilities and performance of global mobile wireless broadband systems that many thought at the time was something that could not be reached in this decade.  When ITU-R established the detailed performance requirements of IMT-Advanced in 2008, it truly raised the bar for mobile wireless. It is gratifying to note that the stakeholders in the mobile wireless industry have risen to the challenge. And we have every expectation that with these proposals the vision can indeed be achieved in the near term.

23.    On March 7, 2008, the ITU's Radio communications sector ("ITU-R") proffered the IMT-Advanced standard for 4G technologies: 100 Mbit/s for high mobility communication (e.g., trains and cars), and 1 gigabit per second ("Gbit/s") for low mobility communication.  On December 11, 2008, the ITU-R issued the International Mobile Telecommunications Advanced ("IMT-Advanced"), which provided that 4G mobile devices must also fulfill the following requirements:

a.    scalable channel bandwidths (the ability to operate at different bandwidth allocations) of 5–20 MHz, optionally up to 40 MHz;

b.    peak link spectral efficiency of 15 bit/s/Hz in the downlink, and 6.75 bit/s/Hz in the uplink (meaning that 1 Gbit/s in the downlink should be possible over less than 67 MHz bandwidth);

c.    System spectral efficiency of up to 3 bit/s/Hz/cell in the downlink and 2.25 bit/s/Hz/cell for indoor usage; and,

d.    The ability to offer high quality of service for next generation multimedia support. The ITU's website explains: "IMT-Advanced systems include new capabilities that go beyond IMT-2000, widely deployed since 2000 and referred to as 3G mobile technology."

24.    On October 21, 2010, the ITU-R revised its definition of 4G to include "LTE-Advanced" and "WirelessMAN-Advanced" as "true 4G technologies".

25.     On December 6, 2010, the ITU-R announced that certain forerunners to IMT-Advanced technologies, including WiMax and LTE[4], may be considered "4G" technologies. The ITU-R issued the following press release:

> Following a detailed evaluation against stringent technical and operational criteria, ITU has determined that "LTE-Advanced" and "WirelessMAN-Advanced" should be accorded the official designation of IMT-Advanced. As the most advanced technologies currently defined for global wireless mobile broadband communications, IMT-Advanced is considered as "4G", although it is recognized that this term, while undefined, may also be applied to the forerunners of these technologies, LTE and WiMax, and to other evolved 3G technologies providing a substantial level of improvement in performance and capabilities with respect to the initial third generation systems now deployed. The detailed specifications of the IMT-Advanced technologies will be provided in a new ITU-R Recommendation expected in early 2012.

In other words, although they did not satisfy the requirements of IMT-Advanced (which provided the working definition for 4G technologies), the ITU-R rubber-stamped telecoms' and mobile phone manufacturers' marketing LTE and WiMax as 4G technologies.  Furthermore, while the ITU did not include HSPA+ technology as a 4G technology, its inclusion of "other evolved 3G technologies providing a substantial level of improvement in performance and capabilities with respect to the initial third generation systems now deployed" left open the door for certain release 7 technologies to be dubbed "4G" so long as they had data transfer capabilities that greatly outstripped 3G technologies[5].

---

[4] WiMax and LTE are merely forerunners of "WirelessMAN-Advanced" and "LTE-Advanced" technologies.  WiMax and LTE-Advanced do not have data transfer capabilities anywhere near those of WirelessMAN-Advanced and LTE-Advanced.

[5] For example, HSPA+ can achieve 168 Mbit/s downlink speeds, which are comparable to LTE capabilities, by utilizing a combination of MIMO, high order modulation and dual-cell technology.  However, release 7 category 13, which utilizes 64-QAM modulation but does not use a multi-cell or MIMO techniques, and has a maximum data rate of 17.6 Mbit/s, does not represent a significant departure from 3G capabilities.

26.     Notably, the ITU-R did not identify 3GPP release 5 Category 10 HDSPA technologies, such as the iPhone 4S, in its expansion of the term 4G.  The maximum theoretical downlink speed of 14.4 Mbit/s for the iPhone 4S is comparable to other 3G technologies.

**The iPhone 4, The iPhone 4S & Apple's Changing Of The Network Indicator**

27.     On June 15, 2010, Apple released the iPhone 4.  The iPhone 4 contained a Qualcomm MDM6600 broadband chip that employed the following cellular technologies: EV-DO on CDMA200 networks; EDGE on GSM networks; and, HSPA on UMTS networks.

28.     On October 14, 2011, Apple released the iPhone 4S.  It also contains a Qualcomm MDM6600 chip and utilizes identical cellular technologies as the iPhone 4.  Both the iPhone 4 and the iPhone 4S utilize 16-QAM modulation on HSPA networks, and neither iPhone supports 64-QAM modulation, a MIMO antenna technique or Dual-Cell HSDPA.

29.     Both the iPhone 4 and the iPhone 4S have identical data transmission speeds:  a maximum downlink speed of approximately 14.4 Mbit/s and a maximum uplink speed of approximately 5.76 Mbit/s.  Both phones are release 5 category 10 devices that utilize a 3G HSPA technology.  Both phones utilize a Qualcomm MDM6600 broadband chip with 16 QAM modulation, a bandwidth of 5 MHz, and have peak spectral efficiencies of 2.88 bit/s/Hz in the downlink and 1.15 bit/s/Hz in the uplink.

30.     Neither the iPhone 4 nor the iPhone 4S have WirelessMAN-Advanced, WiMax (Worldwide Interoperability for Microwave Access), LTE-Advanced or LTE (Third Generation Partnership Project Long Term Evolution) capabilities.  Depending on the release, WiMAX has a theoretical downlink speed of up to 365 Mbit/s, and an uplink of up to 376 Mbit/s.  Depending on the version, LTE has a theoretical downlink speed up to 300 Mbit/s, and an uplink of up to 75

Mbit/s.  LTE-Advanced is expected to offer peak rates of up to 1 Gbit/s fixed speeds and 100

Mb/s to mobile users.

31.     iOS is the mobile operating system on the iPhone that is wholly developed, owned and

controlled by Apple.  Formerly known as iPhone OS, iOS is the operating system on all non-

jailbroken iPhones.  iOS is a combination of firmware, software and interface.

32.     Apple has complete control of its iOS operating system, and it is the sole decision maker

with respect to the network indicator that indicates the "generation" of the mobile device

technology.  Apple markets and sells the iPhone 4S hardware and operating system directly to

the consumer as a single package.  Customers buy the iPhone 4S hardware and operating system

together as a single purchase; thus, purchasers of the 4S automatically receive the benefits of the

iOS, including Siri, its Speech Interpretation and Recognition Interface.  iOS does not contain

proprietary content owned by network providers (telecoms).  Apple exclusively provides its iOS

to purchasers of its iPhone, and is not a supplier of software to third party network providers, and

network providers have no control over Apple's iOS, including its network indicator.

33.     Prior to March 7, 2012, the iPhone 4 and the iPhone 4S running on iOS 5.0 or an earlier

iOS operating system displayed "3G" as their network indicators.

34.     On March 7, 2012, while under the leadership of Senior Vice President of iOS Software

Scott Forstall, Apple released the iOS 5.1.  With this iOS update, the network indicator for the

iPhone 4S on the AT&T Mobility HSPA network changed from "3G" to "4G". Although the

iPhone 4 implemented the same network technology as the iPhone 4S (i.e., a Qualcomm

MDM6600), the network indicator on the iPhone 4 on AT&T's network remained "3G" with

iOS 5.1 and later releases.  iOS 5.1 did not change any network standards or telephony protocols,

and iPhones continued to have the same 14.4 Mbit/s downlink capabilities after the change of

network indicator.  This distinction in network indicators for the iPhone 4S and the iPhone 4 has

been perpetuated in subsequent iOS releases although the data transfer capabilities for these

phones on the AT&T network remain the same.  The network indicator for an iPhone 4S on the

AT&T HSPA network appeared as follows:



35.     The iPhone 4S on display in Apple stores and other stores where the iPhone 4S is sold

bears "4G" network indicators when connected to the AT&T HSPA network.  In these same

locations, the display devices for the iPhone 4 indicated that it was a 3G mobile technology.

36.     The network indicator on the iPhone 4S of persons who owned the mobile device on the

AT&T's network prior to March 7, 2012 read "3G" until those individuals updated their

operating system to iOS 5.1.  Once the 4S was updated to iOS 5.1 or later, the network indicator

read "4G".

37.     The network indicators on the iPhone 4S on other networks, including Sprint and

Verizon, read "3G".

38.     An iPhone 4S with 16 gigabytes ("GB") of memory costs between costs $199.00 when

purchased with a two-year service contract with AT&T Mobility.  Without the two-year service

contract, the iPhone 4S costs $649.00.

39.     A 32 GB iPhone 4S costs $299.00 with a two-year service contract through AT&T

Mobility.  The same phone costs $749.00 without a two-year service contract.

40.     A 64GB iPhone 4S costs $399.00 with a two-year service contract through AT&T

Mobility.  The same phone costs $849.00 without a two-year service contract.

41.     While Apple lowers its prices for older iPhones when new models become available,

Apple has consistently charged at least $200 more for 4G iPhones than it charged for 3G

iPhones.  Apple charged no less than $200.00 more for an iPhone 5, which is a 4G LTE phone,

than it charged for an iPhone 4S with the same storage capacity.  Currently, Apple's latest 4G

iPhone is the iPhone 6, which Apple sells unlocks for $749.00 for the 16 GB phone and $849.00

for a 64 GB phone.

**The iPhone 4S Is Not A 4G Mobile Technology**

42.    The iPhone 4S is not a 4G mobile device for one or more of the following reasons:

   a.    It is incapable of data transfer speeds of 100 Mbit/s for high mobility
         communication (over 100 km/h), and 1 gigabit per second for low mobility
         communication (e.g., stationary).

   b.    It does not have scalable channel bandwidths of 5-20MHz;

   c.    It does not have a peak link spectral efficiency of 15 bit/s/Hz in the downlink, and
         6.75 bit/s/Hz in the uplink.

   d.    It does not have a system spectral efficiency of up to 3 bit/s/Hz/cell in the
         downlink and 2.25 bit/s/Hz/cell for indoor usage.  It operates at less than 1.89
         bit/s/Hz/cell.

   e.    It does not have the ability to offer high quality of service for next generation
         multimedia support, such as high-definition streaming video.

   f.    It does not contain LTE-Advanced, LTE, WirelessMAN-Advaced or WiMAX
         technologies.

   g.    It is a 3GPP release 5 category 10 device;

   h.    It is not an "evolved 3G technology" that provides a substantial level of
         improvement from 3G technologies such as Evolved High-Speed Packet Access
         (HSPA+) that utilizes a combination of high-order modulation (64-QAM), MIMO
         antenna technique and/or dual-cell technology specified in 3GPP release 7 and
         later releases.

   i.    It does not provide a substantial level of improvement in performance and
         capabilities in relation to 3G mobile devices.

43.     In fact, because the iPhone 4S does not utilize either 64 QAM modulation or a MIMO antenna technique, it does not operate as either an HSPA+ mobile device.  Rather, the iPhone 4S is a 3G phone.

44.     The iPhone 4S is a 3G technology with 3G data transfer capabilities due to the cellular technology it contains (i.e., the hardware) and not the network to which it is connected. While AT&T has updated its networks to include LTE technology and HDSPA 21.1 in certain markets, the capabilities of the iPhone 4S remain static at 3G 14.4 Mbit/s downlink speeds.  The fact that the network indicator for the iPhone 4S displays "4G" when connected to the AT&T network reflects Apple's decision to market this phone as a 4G mobile device rather than AT&T's network capabilities.  In other words, the iPhone 4S is a 3G phone with 3G capabilities irrespective of the network to which it is connected.  The claims of Plaintiffs and their putative classes solely concern the shortcomings of Apple's hardware and operating system in the iPhone 4S, and these claims do not concern or involve AT&T or its network.  The only relationship between AT&T and the claims in this lawsuit is that Apple chose to market the AT&T iPhone 4S as a 4G phone.

**Apple Knew The iPhone 4S Was Not A 4G Technology**

45.     Apple had constructive and actual knowledge that the iPhone 4S was not a 4G phone. When the 4S was released in October, 2011, Phil Shiller, Senior Vice President of World Marketing for Apple, said that the then-new iPhone 4S' 5.8 Mbps upload and 14.4 Mbps download speeds matched what Apple's competitors called 4G, but stated that Apple was "not going to get into a debate about what's 4G and what isn't."  In other words, Apple executives were aware of both the standards for 4G mobile technologies, as well as the fact that their phone did not meet those standards.

46.     Apple was criticized widely by the American tech media for mislabeling the iPhone 4S as a 4G device.  Marguerite Reardon of CNET News, one of the largest tech news site in the country, criticized the iPhone 4S for not complying with ITU standards for 4G technologies.  <u>See</u> Marguerite Reardon, "Has '4G' lost its meaning?" (http://news.cnet.com/8301-30686_3-20028622-266.html)(Jan. 18, 2011).  <u>See also</u> Marguerite Reardon, "Has iOS 5.1 turned the iPhone 4S into a 4G device overnight?" (http://news.cnet.com/8301-30686_3-57393828-266/has-ios-5.1-turned-the-iphone-4s-into-a-4g-device-overnight/)(Mar. 9, 2012).  Lex Friedman at MacWorld, the largest Macintosh-focused magazine in North America, wrote that the change in label for the iPhone 4S with the iOS 5.1 update "falls somewhere between semantics and marketing." Lex Friedman, "iOS 5.1 update brings 4G label to iPhone 4S on AT&T's network", (http://www.macworld.com/article/1165768/ios_5_1_update_brings_4g_label_to_iphone_4s_on_atandts_network.html)(Mar. 8, 2012).

**Plaintiffs' Purchase Of The iPhone 4S**

47.     Plaintiff Patrick Jones bought his iPhone 4S in July, 2013 from the AT&T store in Collinsville. He paid $1 for the 16GB phone when he signed up for a service contract, and the remainder of the cost of the phone was paid through his service contract. His previous phone was an iPhone 3GS.

48.     Plaintiff Kyle Stirnaman bought his iPhone 4S on April 26, 2012 from the AT&T store in Edwardsville.  He paid $200 for the 16GB phone when he signed up for a service contract, and the remainder of the cost of the phone was paid through his service contract.  His previous phone was 3G T-Mobile MyTouch 3G smartphone.

49.     Plaintiffs purchased their iPhone 4Ss because they wanted to upgrade to 4G smartphones with 4G capabilities.  They would not have bought the iPhone 4S if they had known it did not have 4G capabilities.

## COUNT I: CONSUMER FRAUD

50.     Plaintiffs incorporates by reference paragraphs 1-49 of this Complaint.

### Class Allegations

51.     Plaintiffs' Class is defined as follows: all Illinois citizens who bought an iPhone 4S for personal use on or after March 7, 2012 that displays "4G" on the network indicator when connected to an HSPA network.  Excluded from Plaintiffs' Class are: (1) Defendant, its employees, and all persons who have or had a controlling interest in the Defendant corporation; (2) Defendant's legal representatives, predecessors, successors and assigns; (3) the judge who is assigned to this case and his/her immediate family; (4) Plaintiffs' attorneys and their employees; (5) all persons who properly execute and file a timely request for exclusion from the class.

52.     Plaintiffs' proposed Class is comprised of thousands of Defendant's customers, the joinder of which is impracticable, and the members of the Class are so numerous that it is impractical to bring all of them before the Court in this action.  Moreover, the amount of damages suffered individually by each member of the Class is so small as to make lawsuits for its recovery by each individual member of the Class economically unfeasible.

53.     Class treatment of the claims asserted herein will provide substantial benefit to both the parties and the court system. A well-defined commonality of interests in the subject questions of law and fact affects Plaintiffs and all proposed members of the Class.

54.     There are common questions of law and fact applicable to the claims asserted on behalf of the Class. These common questions include but are not limited to:

a.    Whether the iPhone 4S was a 4G phone with 4G capabilities;

b.    Whether the iPhone 4S was a 3G phone with 3G capabilities;

c.    Whether the iPhone 4S satisfied the requirements of IMT-Advanced;

d.    Whether the iPhone 4S contains LTE-Advanced, WirelessMAN-Advanced, or other technologies that represent significant improvements from IMT-2000;

e.    Whether the network indicators for the iPhone 4S displayed "4G" when connected to an HSPA network;

f.    Whether Apple engaged in any deception, fraud, false pretense, false promise, misrepresentation by indicating that the iPhone 4S was a 4G phone;

g.    Whether Apple concealed, suppressed or omitted any material facts in relation to the capabilities of the iPhone 4S as a 3G mobile device;

h.    Whether Apple had actual and/or constructive knowledge that the iPhone 4S was not a 4G phone; and/or

i.    Whether the putative class members incurred damages as a proximate result of Apple's misrepresentation and omissions.

These questions of law and fact predominate over any questions affecting only individual members of Plaintiffs' Class.

55.    Plaintiffs' claims are typical of the claims of the proposed Class, and Plaintiffs will fairly and adequately represent and protect the interests of the proposed Class.  Plaintiffs do not have any interest antagonistic to those of the Class. Plaintiffs have retained competent and experienced counsel in the prosecution of this type of litigation. The questions of law and fact common to the members of the Class, some of which are set out above, predominate over any questions affecting only individual members of the Class.

56.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because members of the Class number in the thousands and individual joinder is impracticable. The expenses and burden of individual litigation would make it impracticable or

impossible for proposed members of the Class to prosecute their claims individually. Trial of Plaintiffs' claims is manageable.

57.     This is the first lawsuit of its kind in the country.

58.     Plaintiffs and some members of his putative class bought the iPhone 4S by means of a service agreement with AT&T.  Apple was paid the cost of the iPhone 4S by the upfront cash paid by the customers as well as by means of the service agreement.  For most consumers, due to the cost of the iPhone 4S, the only way they can purchase the phone is by signing up for a service contract to pay for their phone over time in conjunction with a service contract.  The majority of consumers, like Plaintiffs, cannot afford the upfront cost of an iPhone. Other members of the putative class bought the iPhone 4S for purpose of use on the AT&T network without a service contract with AT&T.

59.     Defects with the iPhone 4S and its operating system, and conflicts arising therefrom, were not covered by the service agreement; instead, these defects were covered by the iPhone warranty.  Plaintiffs and their putative class knew that, if there was any problem with the hardware or operating system of the iPhone 4S, they would need to address those problems with Apple directly, and not with AT&T.  Each iPhone 4S had a limited warranty whereby Apple would address hardware and iOS problems and make any necessary repairs to the telephone. Furthermore, Plaintiffs and many members of their putative class bought an AppleCare Plus warranty whereby Apple would continue to address problems and make repairs to the telephone after the limited warranty expired.  Because the warranty directed Plaintiffs and their putative class to address hardware and operating system issues directly with Apple, Plaintiffs and applicable members of their putative class believed that the any conflicts involving iPhone 4S

hardware and operating system would be addressed with Apple directly, and would not be subject to an arbitration agreement with AT&T.

60.    Furthermore, because the explicit language of the arbitration clause in the service agreement limited the arbitration of conflicts to those between AT&T and the consumer, Plaintiffs and those members of their putative class who bought an iPhone 4S by means of a service agreement believed that disputes with Apple were not subject to arbitration.  The arbitration clause in the service contract provided that AT&T customer service was the first means of resolving disputes with AT&T, and this clause did not address or concern the means of resolving disputes with Apple. The service agreement is devoid of any indication that non-signatories to the agreement would be subject to mandatory arbitration.  Neither Plaintiffs nor their putative class agreed or consented to arbitrate claims with Apple, nor did they have any reason to believe that disputes concerning the hardware and the operating system of the iPhone 4S would be resolved in arbitration.

61.    Moreover, the service agreement between AT&T and Plaintiffs and their putative class explicitly excluded all of Apple's rights related to its copyrights and trademarks from the terms of the agreement.  The subject service agreement stated Apple reserved all rights with respect to its trademarks and copyrights in relation to the iPhone and iOS.  The claims in this lawsuit concern iOS 5.1 and later versions of iOS that display on the network indicator that the iPhone 4S is a 4G mobile device.  The iOS on the iPhone 4S is copyrighted software that is wholly owned and controlled by Apple. The service agreement provides that "[a]ll rights [are] reserved" with respect to Apple's trademarks and copyrights for the iPhone.  In other words, Apple's intellectual property rights for the iOS on the iPhone are separate and distinct from the contract rights in the service agreement.  Because of this, Plaintiffs and applicable members of their

putative class believed that any conflict with Apple concerning its iOS would be resolved directly with Apple instead of by means of the arbitration provisions in the service agreement.

62.     Apple was not a signatory or party to the subject service agreement.  There is no agency relationship between Apple and AT&T.  Plaintiffs and their putative class made no representations or took any other actions that Apple relied upon to their detriment with respect to the service agreement.  Plaintiffs and their putative class did not rely upon any representations by AT&T in buying iPhone 4Ss.  The claims in this lawsuit do not relate-to or concern: anything arising out of or relating to any aspect of the relationship between AT&T and Plaintiffs and their putative class; any claims that arose in relation to a prior service agreement; any claims that are currently the subject of purported class action litigation; or, any claims that concern AT&T that arose after the service agreement.  Apple is not an authorized user, unauthorized user or beneficiary of the services or devices under the subject service agreement or prior service agreements between AT&T and Plaintiffs and their putative class.  The subject service agreements were not written so broadly as to include claims that arise against Apple.

63.     Lastly, the subject service agreement explicitly excludes information from third parties (i.e., non-signatories) from the terms of the service agreement and directs consumers to follow those policies established by third parties.

> AT&T IS NOT A PUBLISHER OF THIRD-PARTY INFORMATION, APPLICATIONS, OR OTHER CONTENT AND IS NOT RESPONSIBLE FOR ANY OPINIONS, ADVICE, STATEMENTS, OR OTHER INFORMATION, SERVICES OR GOODS PROVIDED BY THIRD PARTIES.
>
> *        *        *
>
> Policies regarding intellectual property, privacy and other policies or terms of use may differ among AT&T's content or service providers and you are bound by such policies or terms when you visit their respective sites or use their services.

In other words, information from non-signatories to the service contract are governed by the policies of the providers of that information, and not the terms of the service agreement.  The

information that the iPhone 4S displays on the network indicator is not acquired through the service provided by AT&T.

**Cause Of Action**

64.     Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.  The ICFA provides a cause of action for violations of this statute that result in injury to Illinois consumers. 815 ILCS 505/10a.

65.     Plaintiffs and the putative class members were consumers for the purpose of the ICFA. They bought their iPhone 4S for personal use, and not for resale or business purposes.

66.     The iPhone 4S is merchandise for the purpose of the ICFA.  It is an object, good or commodity that was placed by Apple in the stream of commerce.

67.     On or about March 7, 2012, with the introduction of iOS 5.1, Apple represented the iPhone 4S as 4G phone on the AT&T network by means of phone's network indicator.

68.     Beginning March 7, 2012 and continuing thereafter, Apple employed one or more of the following deceptions, frauds, false pretenses, false promises or misrepresentations of material fact:

     a.     That the iPhone 4S is a 4G mobile device with 4G capabilities;

     b.     That the iPhone 4S does not implement 3G mobile technology;

c.     That the iPhone 4S conforms to the standard for 4G devices as defined by the IMT-Advanced;

d.     That the iPhone 4S has data transmission comparable to other 4G technologies such as WirelessMAN-Advanced, LTE-Advanced, WiMax and LTE;

e.     That the iPhone 4S has faster data transmission than 3G mobile devices;

f.     That the iPhone 4S contains a different generation of cellular hardware technology than the iPhone 4;

g.     That iOS 5.1 or later operating system changed the iPhone 4S from a 3G technology to a 4G technology;

h.     That the iPhone 4S is capable of faster data transmission than the iPhone 4;

i.     That the iPhone 4S operating iOS 5.1 was a different generation of mobile technology than the same phone on the same network operating iOS 5.0; and/or,

j.     That iOS 5.1 changed the telecommunication protocols or data transmission speed on the iPhone 4S in relation to iOS 5.0 when the network indicator changed from "3G" to "4G".

69.    Beginning March 7, 2012 and continuing thereafter, Apple employed one or more of the following concealments, suppressions or omissions of material fact:

a.     That the iPhone 4S does not conform to the standard for 4G devices set by the IMT-Advanced;

b.     That the iPhone 4S's HSPA telecommunication protocols have a maximum data transmission speed downlink speed of approximately one-seventieth $(1/70^{th})$ the 4G data speed transmissions standard set by the ITU-R in March, 2008;

c.     That the iPhone 4S does not have data transmission speeds as fast as 4G technologies such as WirelessMan-Advanced, LTE-Advanced, WiMax or LTE;

d.     That the iPhone 4S's telecommunication protocols have a maximum data speed of less than one-twentieth $(1/20^{th})$ the downlink capacity of other technologies that are earned the 4G designation, such as LTE which has a maximum downlink capacity of 300 Mbit/s;

e.     That the iPhone 4S is a 3G mobile device;

f.     That the iPhone 4S does not have faster data transmission than 3G mobile devices;

g.     That the iPhone 4S does not contain the features necessary to obtain data transmission speeds of HSPA+ technologies such as 3GPP Release 7 Category 13, including high order modulation (64-QAM), MIMO antenna technique or Dual Cell technology ;

h.     That the iPhone 4S is incapable of faster data transmission speeds than HSPA mobile devices that conform to 3GPP Release 5 Category 10;

i.     That the iPhone 4S contains the same generation of cellular hardware technology as the iPhone 4;

j.     That the iPhone 4S is incapable of faster data transmission than the iPhone 4; and/or,

k.     That iOS 5.1 did not change the telecommunication protocols or data transmission speed on the iPhone 4S in relation to iOS 5.0 when the network indicator changed from "3G" to "4G".

70.     Apple's representation of the iPhone 4S as a 4G mobile device was a deceptions, frauds, false promises, misrepresentations and/or false statements of material fact that Apple made in the course of conduct involving trade or commerce.  Likewise, Apple's concealments, suppressions or omissions of material fact were made in the course of conduct involving trade or commerce. Apple intended Plaintiffs and the putative class members to rely on its misrepresentations and omissions of material fact in purchasing a phone.

71.     Apple knowingly made the aforementioned deceptions, frauds, false promises, misrepresentations, false statements, concealments, suppressions, and omissions of material fact in the course of commerce.   Apple knew its statements were false, and that they constituted deceptions, frauds, false promises, misrepresentations and omissions. Plaintiffs and the members

of the putative class would not have bought the iPhone 4S if they had known it was not a 4G mobile device.

72.     Apple engaged the aforementioned fraudulent practices on and before the date when Plaintiffs and the members of the putative class bought the mobile device.  The display devices in stores where Plaintiffs and the putative class members bought the iPhone 4S indicated that the phones were 4G mobile devices.

73.     Apple made the subject deceptions, frauds, false promises, misrepresentations and/or false statements of material facts with the intention of inducing Plaintiffs and the members of the putative class to buy an iPhone 4S. Apple acted to increase its profits and to increase its market share in the smartphone market in relation to hardware competitors such as Samsung Group and Research in Motion (BlackBerry), and against mobile smartphone operating system competitors such as Microsoft Corporation (Windows) and Google Inc. (Droid).

74.     The purchase of the iPhone 4S by Plaintiffs and the putative class members was proximately caused by Apple's deceptive acts, misrepresentations and omissions, and they incurred damages as a proximate result of Apple's deceptive practices.  Plaintiffs and their putative class incurred actual damages in the amount of the cost of Apple's latest 4G iPhone, without a service contract, with equal storage capabilities.  Plaintiffs and their putative class incurred damages in an amount greater than $5,000,000.00.

75.     Apple's actions were willful and malicious, meriting entry of a punitive award that would deter this hundred billion dollar company from future fraud.

        **WHEREFORE**, Plaintiffs pray that the Court grant Plaintiff the relief set forth in their REQUEST FOR RELIEF at the end of this Complaint.

## COUNT II: COMMON LAW FRAUDULENT OMISSION

76.    Plaintiffs incorporate by reference paragraphs 1-49 of this Complaint.

### Class Allegations

77.    Plaintiffs' Class is defined as follows: all Illinois citizens who bought an iPhone 4S on or after March 7, 2012 that displays "4G" on the network indicator when connected to an HSPA network.  Excluded from Plaintiffs' Class are: (1) Defendant, its employees, and all persons who have or had a controlling interest in the Defendant corporation; (2) Defendant's legal representatives, predecessors, successors and assigns; (3) the judge who is assigned to this case and his/her immediate family; (4) Plaintiffs' attorneys and their employees; (5) all persons who properly execute and file a timely request for exclusion from the class.

78.    Plaintiffs' proposed Class is comprised of thousands of Defendant's customers, the joinder of which is impracticable, and the members of the Class are so numerous that it is impractical to bring all of them before the Court in this action.  Moreover, the amount of damages suffered individually by each member of the Class is so small as to make lawsuits for its recovery by each individual member of the Class economically unfeasible.

79.    Class treatment of the claims asserted herein will provide substantial benefit to both the parties and the court system. A well-defined commonality of interests in the subject questions of law and fact affects Plaintiffs and all proposed members of the Class.

80.    There are common questions of law and fact applicable to the claims asserted on behalf of the Class. These common questions include but are not limited to:

    a.    Whether the iPhone 4S was a 4G phone with 4G capabilities;

    b.    Whether the iPhone 4S was a 3G phone with 3G capabilities;

    c.    Whether the iPhone 4S satisfied the requirements of IMT-Advanced;

d.     Whether the iPhone 4S contains LTE-Advanced, WirelessMAN-Advanced, or other technologies that represent significant improvements from IMT-2000;

e.     Whether the network indicators for the iPhone 4S displayed "4G" when connected to an HSPA network;

f.      Whether Apple concealed, suppressed or omitted material facts in relation to the capabilities of the iPhone 4S as a 3G mobile device;

g.     Whether Apple had actual and/or constructive knowledge that the iPhone 4S was not a 4G phone;

h.     Whether reliance may be presumed on behalf of the putative class for the purpose of their fraudulent omissions claims; and/or,

i.      Whether the putative class members incurred damages that were the proximate result of Apple's omissions, including the cost of the phone and/or the cost of terminating the service plan.

These questions of law and fact predominate over any questions affecting only individual members of Plaintiffs' Class.

81.    Plaintiffs' claims are typical of the claims of the proposed Class, and Plaintiffs will fairly and adequately represent and protect the interests of the proposed Class. Plaintiffs do not have any interest antagonistic to those of the Class. Plaintiffs have retained competent and experienced counsel in the prosecution of this type of litigation. The questions of law and fact common to the members of the Class, some of which are set out above, predominate over any questions affecting only individual members of the Class.

82.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because members of the Class number in the thousands and individual joinder is impracticable. The expenses and burden of individual litigation would make it impracticable or impossible for proposed members of the Class to prosecute their claims individually. Trial of Plaintiffs' claims is manageable.

83.     This is the first lawsuit of its kind in the country.

84.     Plaintiffs and some members of his putative class bought the iPhone 4S by means of a service agreement with AT&T.  Apple was paid the cost of the iPhone 4S by the upfront cash paid by the customers as well as by means of the service agreement.  For most consumers, due to the cost of the iPhone 4S, the only way they can purchase the phone is by signing up for a service contract to pay for their phone over time in conjunction with a service contract.  The majority of consumers, like Plaintiffs, cannot afford the upfront cost of an iPhone. Other members of the putative class bought the iPhone 4S for purpose of use on the AT&T network without a service contract with AT&T.

85.     Defects with the iPhone 4S and its operating system, and conflicts arising therefrom, were not covered by the service agreement; instead, these defects were covered by the iPhone warranty.  Plaintiffs and their putative class knew that, if there was any problem with the hardware or operating system of the iPhone 4S, they would need to address those problems with Apple directly, and not with AT&T.  Each iPhone 4S had a limited warranty whereby Apple would address hardware and iOS problems and make any necessary repairs to the telephone. Furthermore, Plaintiffs and many members of their putative class bought an AppleCare Plus warranty whereby Apple would continue to address problems and make repairs to the telephone after the limited warranty expired.  Because the warranty directed Plaintiffs and their putative class to address hardware and operating system issues directly with Apple, Plaintiffs and applicable members of their putative class believed that the any conflicts involving iPhone 4S hardware and operating system would be addressed with Apple directly, and would not be subject to an arbitration agreement with AT&T.

86.     Furthermore, because the explicit language of the arbitration clause in the service agreement limited the arbitration of conflicts to those between AT&T and the consumer, Plaintiffs and those members of their putative class who bought an iPhone 4S by means of a service agreement believed that disputes with Apple were not subject to arbitration.  The arbitration clause in the service contract provided that AT&T customer service was the first means of resolving disputes with AT&T, and this clause did not address or concern the means of resolving disputes with Apple. The service agreement is devoid of any indication that non-signatories to the agreement would be subject to mandatory arbitration.  Neither Plaintiffs nor their putative class agreed or consented to arbitrate claims with Apple, nor did they have any reason to believe that disputes concerning the hardware and the operating system of the iPhone 4S would be resolved in arbitration.

87.     Moreover, the service agreement between AT&T and Plaintiffs and their putative class explicitly excluded all of Apple's rights related to its copyrights and trademarks from the terms of the agreement.  The subject service agreement stated Apple reserved all rights with respect to its trademarks and copyrights in relation to the iPhone and iOS.  The claims in this lawsuit concern iOS 5.1 and later versions of iOS that display on the network indicator that the iPhone 4S is a 4G mobile device.  The iOS on the iPhone 4S is copyrighted software that is wholly owned and controlled by Apple. The service agreement provides that "[a]ll rights [are] reserved" with respect to Apple's trademarks and copyrights for the iPhone.  In other words, Apple's intellectual property rights for the iOS on the iPhone are separate and distinct from the contract rights in the service agreement.  Because of this, Plaintiffs and applicable members of their putative class believed that any conflict with Apple concerning its iOS would be resolved directly with Apple instead of by means of the arbitration provisions in the service agreement.

88.     Apple was not a signatory or party to the subject service agreement.  There is no agency relationship between Apple and AT&T.  Plaintiffs and their putative class made no representations or took any other actions that Apple relied upon to their detriment with respect to the service agreement.  Plaintiffs and their putative class did not rely upon any representations by AT&T in buying iPhone 4Ss.  The claims in this lawsuit do not relate-to or concern: anything arising out of or relating to any aspect of the relationship between AT&T and Plaintiffs and their putative class; any claims that arose in relation to a prior service agreement; any claims that are currently the subject of purported class action litigation; or, any claims that concern AT&T that arose after the service agreement.  Apple is not an authorized user, unauthorized user or beneficiary of the services or devices under the subject service agreement or prior service agreements between AT&T and Plaintiffs and their putative class.  The subject service agreements were not written so broadly as to include claims that arise against Apple.

89.     Lastly, the subject service agreement explicitly excludes information from third parties (i.e., non-signatories) from the terms of the service agreement and directs consumers to follow those policies established by third parties.

> AT&T IS NOT A PUBLISHER OF THIRD-PARTY INFORMATION, APPLICATIONS, OR OTHER CONTENT AND IS NOT RESPONSIBLE FOR ANY OPINIONS, ADVICE, STATEMENTS, OR OTHER INFORMATION, SERVICES OR GOODS PROVIDED BY THIRD PARTIES.
>
> *       *       *
>
> Policies regarding intellectual property, privacy and other policies or terms of use may differ among AT&T's content or service providers and you are bound by such policies or terms when you visit their respective sites or use their services.

In other words, information from non-signatories to the service contract are governed by the policies of the providers of that information, and not the terms of the service agreement.  The information that the iPhone 4S displays on the network indicator is not acquired through the service provided by AT&T.

**Cause Of Action**

90.     On or about March 7, 2012, with the introduction of iOS 5.1, Apple represented the

iPhone 4S as 4G phone on the AT&T HSPA network by means of phone's network indicator.

91.     Beginning March 7, 2012 and continuing thereafter, Apple made one or more of the

following fraudulent omissions of material fact:

    a.     That the iPhone 4S does not conform to the standards for 4G devices set
           by the IMT-Advanced;

    b.     That the iPhone 4S's HSPA telecommunication protocols have a
           maximum data transmission speed downlink speed of approximately one-
           seventieth ($1/70^{th}$) the 4G data speed transmissions standard set by the
           ITU-R in March, 2008;

    c.     That the iPhone 4S does not have data transmission speed capabilities as
           fast as 4G technologies such as WirelessMan-Advanced, LTE-Advanced,
           WiMax or LTE;

    d.     That the iPhone 4S's telecommunication protocols have a maximum data
           speed of less than one-twentieth ($1/20^{th}$) the downlink capacity of other
           technologies that are earned the 4G designation, such as LTE which has a
           maximum downlink capacity of 300 Mbit/s;

    e.     That the iPhone 4S is a 3G mobile device;

    f.     That the iPhone 4S does not have faster data transmission than 3G mobile
           devices;

    g.     That the iPhone 4S does not contain the features necessary to obtain data
           transmission speeds of HSPA+ technologies such as 3GPP Release 7
           Category 13, including high order modulation (64-QAM), MIMO antenna
           technique or Dual Cell technology ;

    h.     That the iPhone 4S is incapable of faster data transmission speeds than
           HSPA mobile devices that conform to 3GPP Release 5 Category 10;

    i.     That the iPhone 4S contains the same generation of cellular hardware
           technology as the iPhone 4;

    j.     That the iPhone 4S is incapable of faster data transmission than the iPhone
           4;

k.  That the iPhone 4S contains the same generation of telephone technology as the iPhone 4; and/or,

l.  That iOS 5.1 did not change the telecommunication protocols or data transmission speed on the iPhone 4S in relation to iOS 5.0 when the network indicator changed from "3G" to "4G".

92.  Apple knowingly made the aforementioned fraudulent omissions of material fact. Apple had actual and constructive knowledge that the iPhone 4S was not a 4G phone.

93.  Apple engaged the aforementioned fraudulent practices on and before the date when he and the members of the putative class bought the mobile device. The display devices in stores where Plaintiffs and the putative class members bought the iPhone 4S indicated that the phones were 4G mobile devices.

94.  Apple made the subject fraudulent omissions of material fact with the intention of inducing Plaintiffs and the members of the putative class to buy an iPhone 4S. Apple acted to increase its profits and to increase its market share in the smartphone market in relation to hardware competitors such as Samsung Group and Research in Motion (BlackBerry), and against mobile smartphone operating system competitors such as Microsoft Corporation (Windows) and Google Inc. (Droid).

95.  Plaintiffs and the members of the putative class bought the iPhone 4S in reliance on Apple's fraudulent omissions. Plaintiffs and the members of the putative class would not have bought the iPhone 4S if they had known it was a 3G mobile device, or that it contained the same generation of telecommunications technology as the iPhone 4.

96.  Plaintiffs and the putative class members incurred actual damages that were proximately caused by Apple's deceptions and omissions, and their reliance on Apple's deceptive practices. Plaintiffs and their putative class incurred damages in the amount of the cost of Apple's latest 4G

iPhone, without a contract, with equal storage capabilities.  The damages incurred by Plaintiffs and their putative class exceed $5,000,000.00.

97.     Apple's actions were willful and malicious, meriting entry of a punitive award that would deter this hundred billion dollar company from future fraud.

**WHEREFORE**, Plaintiffs pray that the Court grant Plaintiffs the relief set forth in their REQUEST FOR RELIEF at the end of this Complaint.

## COUNT III – UNJUST ENRICHMENT

98.     Plaintiffs incorporate by reference paragraphs 1-49 of this Complaint.

### Class Allegations

99.     Plaintiffs' Class is defined as follows: all Illinois citizens who bought an iPhone 4S on or after March 7, 2012 that displays "4G" on the network indicator when connected to an HSPA network.  Excluded from Plaintiffs' Class are: (1) Defendant, its employees, and all persons who have or had a controlling interest in the Defendant corporation; (2) Defendant's legal representatives, predecessors, successors and assigns; (3) the judge who is assigned to this case and his/her immediate family; (4) Plaintiffs' attorneys and their employees; (5) all persons who properly execute and file a timely request for exclusion from the class.

100.    Plaintiffs' proposed Class is comprised of thousands of Defendant's customers, the joinder of which is impracticable, and the members of the Class are so numerous that it is impractical to bring all of them before the Court in this action.  Moreover, the amount of damages suffered individually by each member of the Class is so small as to make lawsuits for its recovery by each individual member of the Class economically unfeasible.

101.    Class treatment of the claims asserted herein will provide substantial benefit to both the parties and the court system. A well-defined commonality of interests in the subject questions of law and fact affects Plaintiffs and all proposed members of the Class.

102.    There are common questions of law and fact applicable to the claims asserted on behalf

of the Class. These common questions include but are not limited to:

a.      Whether the iPhone 4S was a 4G phone with 4G capabilities;

b.      Whether the iPhone 4S was a 3G phone with 3G capabilities;

c.      Whether the iPhone 4S satisfied the requirements of IMT-Advanced;

d.      Whether the iPhone 4S contains LTE-Advanced, WirelessMAN-Advanced, or
        other technologies that represent significant improvements from IMT-2000;

e.      Whether the network indicators for the iPhone 4S displayed "4G" when
        connected to an HSPA network;

f.      Whether Apple was enriched by the money it was paid for the iPhone 4S by
        Plaintiffs and their putative class;

g.      Whether Plaintiffs and their putative class suffered an impoverishment by paying
        Apple the cost of an iPhone 4S;

h.      Whether there was a relation between the enrichment and the impoverishment;

i.      Whether there is an absence of justification; and/or,

j.      Whether there is an absence of other remedy provided by law.

These questions of law and fact predominate over any questions affecting only individual

members of Plaintiffs' Class.

103.    Plaintiffs' claims are typical of the claims of the proposed Class, and Plaintiffs will fairly

and adequately represent and protect the interests of the proposed Class. Plaintiffs do not have

any interest antagonistic to those of the Class.  Plaintiffs have retained competent and

experienced counsel in the prosecution of this type of litigation. The questions of law and fact

common to the members of the Class, some of which are set out above, predominate over any

questions affecting only individual members of the Class.

104.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because members of the Class number in the thousands and individual joinder is impracticable. The expenses and burden of individual litigation would make it impracticable or impossible for proposed members of the Class to prosecute their claims individually. Trial of Plaintiffs' claims is manageable.

105.    This is the first lawsuit of its kind in the country.

106.    Plaintiffs and some members of his putative class bought the iPhone 4S by means of a service agreement with AT&T.  Apple was paid the cost of the iPhone 4S by the upfront cash paid by the customers as well as by means of the service agreement.  For most consumers, due to the cost of the iPhone 4S, the only way they can purchase the phone is by signing up for a service contract to pay for their phone over time in conjunction with a service contract.  The majority of consumers, like Plaintiffs, cannot afford the upfront cost of an iPhone. Other members of the putative class bought the iPhone 4S for purpose of use on the AT&T network without a service contract with AT&T.

107.    Defects with the iPhone 4S and its operating system, and conflicts arising therefrom, were not covered by the service agreement; instead, these defects were covered by the iPhone warranty.  Plaintiffs and their putative class knew that, if there was any problem with the hardware or operating system of the iPhone 4S, they would need to address those problems with Apple directly, and not with AT&T.  Each iPhone 4S had a limited warranty whereby Apple would address hardware and iOS problems and make any necessary repairs to the telephone. Furthermore, Plaintiffs and many members of their putative class bought an AppleCare Plus warranty whereby Apple would continue to address problems and make repairs to the telephone after the limited warranty expired.  Because the warranty directed Plaintiffs and their putative

34

class to address hardware and operating system issues directly with Apple, Plaintiffs and applicable members of their putative class believed that the any conflicts involving iPhone 4S hardware and operating system would be addressed with Apple directly, and would not be subject to an arbitration agreement with AT&T.

108.    Furthermore, because the explicit language of the arbitration clause in the service agreement limited the arbitration of conflicts to those between AT&T and the consumer, Plaintiffs and those members of their putative class who bought an iPhone 4S by means of a service agreement believed that disputes with Apple were not subject to arbitration.  The arbitration clause in the service contract provided that AT&T customer service was the first means of resolving disputes with AT&T, and this clause did not address or concern the means of resolving disputes with Apple. The service agreement is devoid of any indication that non-signatories to the agreement would be subject to mandatory arbitration.  Neither Plaintiffs nor their putative class agreed or consented to arbitrate claims with Apple, nor did they have any reason to believe that disputes concerning the hardware and the operating system of the iPhone 4S would be resolved in arbitration.

109.    Moreover, the service agreement between AT&T and Plaintiffs and their putative class explicitly excluded all of Apple's rights related to its copyrights and trademarks from the terms of the agreement.  The subject service agreement stated Apple reserved all rights with respect to its trademarks and copyrights in relation to the iPhone and iOS.  The claims in this lawsuit concern iOS 5.1 and later versions of iOS that display on the network indicator that the iPhone 4S is a 4G mobile device.  The iOS on the iPhone 4S is copyrighted software that is wholly owned and controlled by Apple. The service agreement provides that "[a]ll rights [are] reserved" with respect to Apple's trademarks and copyrights for the iPhone.  In other words, Apple's

intellectual property rights for the iOS on the iPhone are separate and distinct from the contract rights in the service agreement. Because of this, Plaintiffs and applicable members of their putative class believed that any conflict with Apple concerning its iOS would be resolved directly with Apple instead of by means of the arbitration provisions in the service agreement.

110.    Apple was not a signatory or party to the subject service agreement. There is no agency relationship between Apple and AT&T. Plaintiffs and their putative class made no representations or took any other actions that Apple relied upon to their detriment with respect to the service agreement. Plaintiffs and their putative class did not rely upon any representations by AT&T in buying iPhone 4Ss. The claims in this lawsuit do not relate-to or concern: anything arising out of or relating to any aspect of the relationship between AT&T and Plaintiffs and their putative class; any claims that arose in relation to a prior service agreement; any claims that are currently the subject of purported class action litigation; or, any claims that concern AT&T that arose after the service agreement. Apple is not an authorized user, unauthorized user or beneficiary of the services or devices under the subject service agreement or prior service agreements between AT&T and Plaintiffs and their putative class. The subject service agreements were not written so broadly as to include claims that arise against Apple.

111.    Lastly, the subject service agreement explicitly excludes information from third parties (i.e., non-signatories) from the terms of the service agreement and directs consumers to follow those policies established by third parties.

> AT&T IS NOT A PUBLISHER OF THIRD-PARTY INFORMATION, APPLICATIONS, OR OTHER CONTENT AND IS NOT RESPONSIBLE FOR ANY OPINIONS, ADVICE, STATEMENTS, OR OTHER INFORMATION, SERVICES OR GOODS PROVIDED BY THIRD PARTIES.
> *      *      *
> Policies regarding intellectual property, privacy and other policies or terms of use may differ among AT&T's content or service providers and you are bound by such policies or terms when you visit their respective sites or use their services.

In other words, information from non-signatories to the service contract are governed by the policies of the providers of that information, and not the terms of the service agreement.  The information that the iPhone 4S displays on the network indicator is not acquired through the service provided by AT&T.

**Cause Of Action**

112.    On or about March 7, 2012, with the introduction of iOS 5.1, Apple represented the iPhone 4S as 4G phone on the AT&T network by means of phone's network indicator.

113.    Beginning March 7, 2012 and continuing thereafter, Apple made one or more of the following misrepresentations of material fact that Apple knew or should have known were false, wrongful, negligent, illegal and/or fraudulent::

    a.    That the iPhone 4S is a 4G mobile device;

    b.    That the iPhone 4S does not implement 3G mobile technology;

    c.    That the iPhone 4S conforms to the standard for 4G devices as defined by the IMT-Advanced;

    d.    That the iPhone 4S has data transmission comparable to other 4G technologies such as WirelessMAN-Advanced, LTE-Advanced, WiMax and LTE;

    e.    That the iPhone 4S has faster data transmission than 3G mobile devices;

    f.    That the iPhone 4S contains a different generation of cellular hardware technology than the iPhone 4;

    g.    That iOS 5.1 or later operating system changed the iPhone 4S from a 3G technology to a 4G technology;

    h.    That the iPhone 4S is capable of faster data transmission than the iPhone 4;

    i.    That the iPhone 4S operating iOS 5.1 was a different generation of mobile technology than the same phone on the same network operating iOS 5.0; and/or,

j.     That iOS 5.1 changed the telecommunication protocols or data transmission speed on the iPhone 4S in relation to iOS 5.0 when the network indicator changed from "3G" to "4G".

114.    Beginning March 7, 2012 and continuing thereafter, Apple wrongfully, negligently, illegally and/or fraudulently suppressed, concealed or omitted one or more of the following material facts:

a.     That the iPhone 4S does not conform to the standard for 4G devices set by the IMT-Advanced;

b.     That the iPhone 4S's HSPA telecommunication protocols have a maximum data transmission speed downlink speed of approximately one-seventieth (1/70th) the 4G data speed transmissions standard set by the ITU-R in March, 2008;

c.     That the iPhone 4S does not have data transmission speeds as fast as 4G technologies such as WirelessMan-Advanced, LTE-Advanced, WiMax or LTE;

d.     That the iPhone 4S's telecommunication protocols have a maximum data speed of less than one-twentieth (1/20th) the downlink capacity of other technologies that are earned the 4G designation, such as LTE which has a maximum downlink capacity of 300 Mbit/s;

e.     That the iPhone 4S is a 3G mobile device;

f.     That the iPhone 4S does not have faster data transmission than 3G mobile devices;

g.     That the iPhone 4S does not contain the features necessary to obtain data transmission speeds of HSPA+ technologies such as 3GPP Release 7 Category 13, including high order modulation (64-QAM), MIMO antenna technique or Dual Cell technology ;

h.     That the iPhone 4S is incapable of faster data transmission speeds than HSPA mobile devices that conform to 3GPP Release 5 Category 10;

i.     That the iPhone 4S contains the same generation of cellular hardware technology as the iPhone 4;

j.     That the iPhone 4S is incapable of faster data transmission than the iPhone 4; and/or,

        k.     That iOS 5.1 did not change the telecommunication protocols or data transmission speed on the iPhone 4S in relation to iOS 5.0 when the network indicator changed from "3G" to "4G".

Apple knew or should have known that the omissions of material fact created the false impression about the capabilities of the iPhone 4S.

115.    Apple's misrepresentations and omissions of material fact were improper, negligent, reckless, willful, fraudulent and/or illegal.

116.    Apple's aforementioned wrongful, illegal, negligent and/or fraudulent acts proximately caused Plaintiffs and their putative class to purchase an iPhone 4S.  Accordingly, Apple was enriched with the money that Plaintiffs and their putative class paid for the iPhone 4S, and Plaintiffs and their putative class were impoverished by those payments.  Apple acted to increase its profits and to increase its market share in the smartphone market in relation to hardware competitors such as Samsung Group and Research in Motion (BlackBerry), and against mobile smartphone operating system competitors such as Microsoft Corporation (Windows) and Google Inc. (Droid).

117.    Apple has unjustly retained the monies paid by Plaintiffs and their putative class to their detriment.  There is no justification for Apple's wrongful acts or its retention of the monies it was paid.  Defendant's retention of the subject monies violates the fundamental principles of justice, equity and good conscience.

118.    There is no other adequate remedy at law for this alternative claim.

119.    Plaintiffs and their putative class seek the return of the amount that Apple was wrongfully enriched in relation to their purchases of the iPhone 4S, including any interest that Apple made from those monies.  The amount at issue in this Count and the amount that Apple was wrongfully enriched is greater than $5,000,000.00.

**WHEREFORE**, Plaintiffs pray that the Court grant Plaintiffs the relief set forth in their

REQUEST FOR RELIEF at the end of this Complaint.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs pray that this Court:

1)   Certifies the Classes as requested herein, and makes the named Plaintiffs Class Representatives;

2)   Enters an order appointing CHRISTIAN G. MONTROY as lead counsel for the Classes;

3)   Awards the Representative Plaintiffs a class representative fee;

4)   Awards Plaintiffs and their Classes the cost of the latest 4G Apple phone with equal storage capacity for their Consumer Fraud and Common Law Fraudulent Omissions Counts;

5)   Alternatively awards Plaintiffs and their Class the amount that Apple was wrongfully enriched in relation to their Unjust Enrichment claim;

6)   Awards all applicable pre-judgment and post-judgment interest;

7)   Enjoins Apple from representing that the iPhone 4S is a 4G phone;

8)   Awards punitive damages in an amount to be determined at trial; and,

9)   Awards attorneys' fees and costs.

The damages at issue in each of Plaintiffs' Counts exceed $5,000,000.00.


Respectfully submitted,

MONTROY LAW OFFICES, LLC

BY: <u>/s  Christian G. Montroy</u>
Christian G. Montroy
Illinois Bar No. 6283566
412 Missouri Avenue
East St. Louis, Illinois 62201
Phone:  (618) 274-0434
Fax:     (618) 274-8369
cmontroy@montroylaw.com